UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Chris Trombley,

        Plaintiff,

vs.

Wisconsin Central Ltd.,
a foreign corporation d/b/a CN,

        Defendant.

**COMPLAINT**
**JURY TRIAL DEMANDED**

Court File No. _____

Plaintiff, by his attorneys, Fabian May & Anderson, PLLP, brings this action for damages and other legal and equitable relief for Defendant's violations of law. Plaintiff states the following as his claims against Defendant:

## JURISDICTION AND VENUE

1. This action arises under Title I of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.*, as amended by the Americans with Disabilities Act Amendments Act of 2008. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331.

2. The unlawful practices described hereinafter have been committed in the Eastern District of Wisconsin, the employment records relevant to those practices are, upon information and belief, maintained and administered at the offices of Defendant in the Eastern District of Wisconsin, and Defendant does business within the Eastern District of Wisconsin. Therefore, venue is proper under 28 U.S.C. § 1391(b).

## PARTIES

3. Plaintiff Chris Trombley ("Plaintiff" or "Trombley") was a resident of the State of Wisconsin at all times material herein. Trombley currently resides in the State of North Carolina.

4. Defendant Wisconsin Central, Ltd., a corporation d/b/a "CN," ("Defendant") is an interstate railway corporation with facilities and tracks in Fond du Lac, Wisconsin with a registered office address of 8040 Excelsior Drive, Suite 400, City of Madison, County of Dane, State of Wisconsin. Defendant is a wholly owned subsidiary of Canadian National Railway ("CN").

## FACTUAL ALLEGATIONS

5. Plaintiff applied for the position of Freight Conductor Trainee with Defendant at its Fond du Lac terminal in late summer of 2014. Defendant offered Plaintiff the position on the condition that he pass a medical screening and a urinalysis test. During Plaintiff's medical screening he disclosed that he suffered from Post-Traumatic Stress Disorder ("PTSD") as a result of his previous deployments with the United States Marine Corps and provided Defendant with the specific medications he was taking and what they were for. Plaintiff passed his medical screening and urinalysis test and began his employment with Defendant on September 2, 2014.

6. Plaintiff's PTSD and related symptoms substantially and materially limit some of his major life activities. Plaintiff's PTSD did not prevent Plaintiff from successfully performing the essential functions of the position of Freight Conductor Trainee.

2

7. Plaintiff began taking a new medication for his PTSD on or about November 20, 2014. On November 25, 2014, Plaintiff was asked to take a random urinalysis screening at work. While he was not asked about his medications during the screening, Plaintiff voluntarily disclosed that he was taking a new medication for his PTSD. The screening administrator told Plaintiff that as long as the medication had been prescribed it would not be an issue. Later that same day, John Zwicker ("Zwicker"), one of Plaintiff's trainers, mentioned to Plaintiff that it seemed like he was moving slower than usual and asked him what was going on. Plaintiff explained that he had been prescribed a new medication for his PTSD. The conversation did not last long and Plaintiff continued to perform his duties for the remainder of the day.

8. The following day, Plaintiff received a phone call from Defendant's Medical Services informing him that someone had reported that he had been experiencing symptoms of PTSD while at work. Plaintiff explained that he had not been experiencing symptoms of PTSD and that he was simply tired due to his new medication, to which he was adjusting. Despite this explanation, Plaintiff received a letter from Deborah Pruim ("Pruim") of Defendant's Medical Services informing him that he had been placed on a Temporary Medical Disqualification ("TMD") as of November 26, 2014 until December 10, 2014. The letter further explained that Plaintiff would need to have a physician complete and submit a Medical Status Report ("MSR") before he could return to work.

9. On December 3, 2014, Plaintiff's physician faxed a completed MSR to Medical Services clearing Plaintiff to return to work. Plaintiff's physician specifically informed Defendant that while Plaintiff had been diagnosed with PTSD, at no time had

3

he been unable to work. She also informed Defendant that Plaintiff's medical condition and medications would not affect his alertness, coordination, or thinking reactions in regards to safety, he could perform all other activities necessary to do his job without restrictions, and that he was able to continue to work while taking his new medication for his PTSD. Plaintiff's physician also called Defendant several times in an attempt to discuss Plaintiff's immediate return to work in light of the fact that he should not have been disqualified to work in the first place. All attempts by Plaintiff's physician to discuss this issue with Defendant went ignored, and Defendant refused to allow Plaintiff to return to work despite his clearance.

10. Plaintiff was finally allowed to return to work two weeks later, on December 10, 2014.

11. When Plaintiff returned to work after his TMD, the demeanor of trainers Mark Potter ("Potter") and Ruben Witt ("Witt") towards Plaintiff changed. They were very aggressive towards Plaintiff and unnecessarily hard on him in evaluating his performance, which continued to be good. This concerned Plaintiff, as he had not had any issues with either of these trainers before he was put on TMD. Plaintiff asked Derek Schreiner ("Schreiner"), his on-the-job training coordinator ("OJT"), if he should be worried about his job due to the TMD. Schreiner assured Plaintiff he had nothing to worry about as his previous evaluations had all been "gleaming." Plaintiff also spoke with the Chairman of the United Transportation Union for the Fond du Lac terminal, Scott Seggerman ("Seggerman") about the issue. Seggerman also assured Plaintiff he had nothing to worry about.

12. Shortly after Plaintiff returned to work, Seggerman and Schreiner told him that the Superintendent was looking to fire Plaintiff for allegedly not disclosing his PTSD when he was hired and/or not disclosing the new medication he was on for his PTSD. Neither one of these allegations had any basis in fact. Seggerman told Plaintiff that he had conveyed to the Superintendent that it would not be wise for him to fire a combat veteran because of his PTSD, especially when it was not an issue affecting his employment.

13. Plaintiff then spent the next two months, December 2014 through January 2015, working on trains traveling back and forth from Fond du Lac, Wisconsin to Chicago, Illinois.

14. On February 4, 2015, Plaintiff returned to the North Fond du Lac yard for a five-day training rotation in the Conductor position. Potter and Witt were again aggressive towards Plaintiff. Both trainers changed Plaintiff's job tasks randomly without giving him time to catch up. Both trainers also commented that Plaintiff was moving too slow and needed to work faster, even though it was clear that Plaintiff was focused on performing the new tasks he was learning correctly. This treatment towards Plaintiff went on for three days. On the fourth day, Jason Solas ("Solas") was assigned as Plaintiff's trainer. Solas had nothing but good things to say about Plaintiff's work, specifically commenting that he was doing very well and knew everything necessary to perform the job tasks at hand.

15. After Plaintiff completed this five-day rotation he was given two days to stay at home and rest. On the morning of his second rest day, February 11, 2015,

Schreiner called Plaintiff at home and told him that he had multiple evaluations that showed he needed improvement. Plaintiff asked whether or not those evaluations were from the rotation he just finished and Schreiner replied that the poor evaluations dated throughout his entire training. This was despite the fact that Schreiner himself had previously told Plaintiff that his evaluations were "gleaming." Schreiner had also told Plaintiff two weeks earlier that his evaluations continued to look good and that they would soon be working on getting Plaintiff off the yard and "marked up" as a Conductor. Plaintiff reminded Schreiner of those facts and continued to press him for details on his alleged "needs improvement" reviews. Schreiner could not provide Plaintiff with any specifics.

16. A few hours later, Plaintiff received a call from Assistant Superintendent Ed Steinbeck ("Steinbeck"), who requested Plaintiff come to his office for a meeting at 10:00 a.m. the following morning. When Plaintiff arrived, Steinbeck told Plaintiff he was "sorry to do this" and placed a letter in front of him that stated that Plaintiff's employment with Defendant as a Trainman had been "rejected." Steinbeck said he appreciated Plaintiff's service in the Marine Corps, but he knew he was struggling with PTSD and he could not allow Plaintiff to work in railroad operations due to safety concerns that had been noted in his evaluations and the potential damage that might occur. Plaintiff explained that no one at Defendant had ever told him he was acting in an unsafe manner and that he was always very careful on the job. Plaintiff asked Steinbeck to pull up the evaluations that allegedly identified these safety concerns so the two of them could look at them together. Steinbeck claimed he could not pull up the evaluations.

6

17. Steinbeck then asked what Plaintiff's trainers had told him about his performance. Plaintiff replied that out of 60 starts the only feedback he had received was that he was doing a good job. He also noted that his trainers had not provided him with any specific feedback about anything he needed to be working on. Steinbeck concluded the meeting by telling Plaintiff that he thought Plaintiff was a great worker and that he was aware of other positions in Fond du Lac for which he would recommend him. Steinbeck told Plaintiff he would have someone in Human Resources reach out to him about these job opportunities. However, no one ever followed up with Plaintiff about other position openings in Fond du Lac.

## COUNT I

### DISABILITY DISCRIMINATION IN VIOLATION OF
### THE AMERICANS WITH DISABILITIES ACT, 42 U.S.C. § 12101, ET SEQ.

18. By reference hereto, Plaintiff incorporates paragraphs 1-17 above.

19. During all relevant times herein, Plaintiff was an "employee" within the meaning of 42 U.S.C. § 12111(4) and Defendant was a "covered entity" within the meaning of 42 U.S.C. § 12111(2). Plaintiff is a "qualified individual with a disability" as defined by 42 U.S.C. § 12111(8).

20. The Americans with Disabilities Act provides that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to . . . discharge of employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

7

21. The term "discriminate against a qualified individual on the basis of disability" also includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee . . ." 42 U.S.C. § 12112(b)(5)(A).

22. By its conduct described herein, Defendant violated 42 U.S.C. § 12101, *et seq*.

23. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered loss of income, emotional distress, and other damages in an amount in excess of $75,000.00.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Chris Trombley prays for judgment against Defendant Wisconsin Central, Ltd., a foreign corporation d/b/a CN, as follows:

1. For compensatory damages including loss of past and future income, emotional distress, and related damages;

2. For all damages permitted for violations of 42 U.S.C. § 12101 *et seq.*;

3. For punitive damages and all other damages available at law or equity;

4. For costs, disbursement, and attorneys' fees; and

5. For such relief the court deems just and equitable.

Dated:  08/07/2015                                  **FABIAN MAY & ANDERSON, PLLP**

                                                     s/ Jenny M. Helling
                                                    John A. Fabian, #13482X
                                                    Jenny M. Helling, #393145
                                                    1625 Medical Arts Building
                                                    825 Nicollet Mall
                                                    Minneapolis, MN 55402
                                                    Telephone:  (612) 353-3340
                                                    Email: jfabian@fmalawyers.com
                                                    Email: jhelling@fmalawyers.com

                                                    **ATTORNEYS FOR PLAINTIFF**